# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 47890-1-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| TYLER DAVID ROBB, | |
| Appellant. | |

MAXA, A.C.J. – Tyler Robb appeals his convictions of second degree child rape and second degree child molestation relating to his stepdaughter, DIA.

We hold that (1) the trial court properly admitted a deoxyribonucleic acid (DNA) expert's testimony under the *Frye*[1] test and ER 702; (2) the trial court properly ruled that the victim's hearsay statements fell within the excited utterance and medical statement exceptions to the hearsay rule; (3) the prosecutor's statement during closing argument that the standard was whether the jury had an "abiding belief in the truth of the charge" and the prosecutor's discussion of facts not in evidence do not support a prosecutorial misconduct claim; (4) as the State concedes, Robb's second degree child molestation conviction must be vacated on double jeopardy grounds; (5) the trial court did not abuse its discretion in imposing a sentencing condition prohibiting Robb from contacting any minors, including his son; and (6) as the State

---

[1] *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).

concedes, the sentencing conditions regarding controlled substances and sexually explicit material must be stricken.  In addition, we exercise our discretion not to impose appellate costs.

Accordingly, we affirm Robb's second degree child rape conviction, but we remand for the trial court to vacate Robb's second degree child molestation conviction and to strike the sentencing conditions regarding controlled substances and sexually explicit material.

FACTS

Robb married Shannon Robb in 2006.  Shannon[2] had two children from a previous marriage and eventually Robb and Shannon had a third child together.  Shannon's oldest child, DIA, thought of Robb as her father and testified that she had a close relationship with him growing up.

*Sexual Assault*

On April 28, 2014, 13-year-old DIA was sick and decided to stay home from school. DIA went to her parents' bedroom to watch TV while Robb and her two brothers got ready for their day.  Shannon had already left for work.

While DIA was on her parents' bed, Robb came into the room.  Robb lay beside her, putting his hand on her stomach, outside her shirt.  He then slid his hand under her pajama pants and underwear and asked if she "wanted this."  Report of Proceedings (RP) at 98.  DIA could feel his finger reach up into her vaginal area.  She asked Robb to stop.  He complied, but then grabbed her left breast.

DIA stayed in the bed, too scared to get out.  She eventually went downstairs and asked Robb for a bowl of cereal, trying to act as normally as possible "in case he would maybe stay

---

[2] To avoid confusion, we refer to Shannon Robb as Shannon.  No disrespect is intended.

home instead, or thought [DIA] would tell [her] mom." RP at 107. Robb finished getting ready for work and left the house.

DIA immediately texted her mother that "I don't feel safe with Dad." RP at 102. After 10 minutes, Shannon responded and told DIA to go somewhere they could talk over the phone. When DIA called Shannon a few minutes later, she was crying and very emotional and Shannon could barely understand her. Shannon told DIA to take her brothers to their next-door neighbor's house, where the children normally would wait for their school bus. Shannon called the police and drove back home, which she estimated took 30 minutes.

*Neighbor's House*

DIA testified that she was shocked and terrified when she got next door. The neighbor, Angela Gariano, testified that DIA was crying hysterically and was very upset. Gariano sat down on the couch with DIA, who confided that "[m]y dad did something bad to me." RP at 159. DIA indicated that Robb had touched her breast and her vagina. Gariano consoled DIA while they waited for Shannon.

When Shannon arrived, DIA was crying and shaking. Shannon hugged DIA. According to Shannon, DIA "wouldn't stop crying, and she wouldn't let go." RP at 184. DIA and Shannon eventually walked back over to their house to wait for the police. It took DIA about 20 minutes to tell Shannon what had happened, stating that Robb had lay beside her and had asked if this is what she wanted while reaching under her pants and shirt.

*Police Station and Hospital*

When the police had not arrived after another 10 minutes, Shannon and DIA drove to the nearest police station where they reported that DIA had been sexually assaulted. Detective

3

Elizabeth Luvera interviewed DIA and Shannon before telling them to go to the nearby hospital for an examination.

At the pediatric emergency room, Dr. Kathleen Myers conducted a general exam and a sexual assault exam. Dr. Myers also talked with DIA about what happened that morning as part of a format the hospital follows when there is concern of abuse. DIA told the doctor that Robb "put his fingers inside me." RP at 298. Dr. Meyers observed an area of redness or irritation to DIA's vagina that Dr. Meyers considered to be an abnormality.

As part of the exam, swabs were taken to test for DNA where DIA had indicated Robb touched her. In the subsequent DNA analysis, only the swab from DIA's breast provided usable DNA. Even that provided only a partial sample, with 4 out of 17 testable locations on the Y chromosome that scientists examine in generating a DNA profile.

The State charged Robb with second degree child rape and second degree child molestation.

*DNA Expert*

The State sought to have an expert, Brad Dixon, testify about the DNA test results. Robb requested a *Frye* hearing. At the hearing, Dixon explained that he used a form of polymerase chain reaction for short tandem repeats (PCR-STR) analysis that identifies the Y chromosome passed between male family members. From this analysis, known as Y-STR, Dixon indicated that he could determine both whether a suspect was a potential contributor as well as estimate how often a DNA profile occurs in the general population. On cross examination, Robb asked about the predictive power of a test that included only 4 of 17 testable Y chromosome locations.

Dixon indicated that, with fewer testable locations, the possibility that the DNA came from someone other than Robb increased.

At the hearing's conclusion, Robb objected to the admission of Dixon's testimony about the limited DNA profile derived from the Y-STR test results. He argued that even though a Y-STR test of a complete DNA profile would be admissible, testing of a limited profile should not be. The trial court ruled that Dixon could testify about the Y-STR test results, concluding that the challenge related to the weight and credibility of his opinions. Robb did not object to the statistical method or the comparison database Dixon used in his analysis.

*Trial Testimony*

At trial, Gariano, Shannon, and Dr. Myers testified as to what DIA had told them about her contact with Robb. The trial court overruled Robb's hearsay objections. Regarding the first two witnesses, the trial court ruled that DIA's statements fell under the excited utterance hearsay exception. Regarding Dr. Myers, the trial court ruled that DIA's statements were admissible because they were made for the purpose of medical diagnosis.

Dixon also repeated his explanation of the Y-STR analysis. He testified that the analysis could yield three results: Robb could be included as a possible source of the DNA, he could be excluded, or the results could be inconclusive. Dixon's test results showed that "neither Tyler Robb nor any of his paternal male relatives can be excluded" as the DNA source, and therefore Robb was a "potential contributor." RP at 224, 227. Dixon testified that he compared the DNA swab to the "U.S. Y-STR Database" and concluded that it matched one in nine males nationally. RP at 228. Robb briefly asked about the "count method" that Dixon used to arrive at that number, but did not challenge Dixon's methodology or the U.S. Y-STR Database Dixon used.

*Closing Argument*

During closing argument, the prosecutor explained the State's burden of proof to the jury. The prosecutor stated that proving Robb's guilt beyond a reasonable doubt was a "tall order" and a "heavy burden." RP at 470. She later characterized the standard as whether the jury had an "abiding belief in the truth of the charge," stating that Robb was guilty beyond a reasonable doubt if the jury had an "abiding belief" in the accuracy of the trial testimony. RP at 488. Robb did not object to this characterization.

The prosecutor also discussed the DNA sample taken at DIA's exam. She told the jury that it was not unusual to recover only a partial DNA sample and added that it was "more likely" that a recoverable sample would be on DIA's breast. RP at 510. Robb did not object.

Finally, the prosecutor attempted to discredit any notion that DIA could have made up these events. The prosecutor argued that, if DIA had attempted to carry out a hoax, she would have had to make consistent statements "to a neighbor, and then to a treatment provider and then to a detective." RP at 511. Robb objected to this statement on the grounds that detective Luvera did not testify as to what DIA told her. The trial court sustained the objection, telling the prosecutor to "argue the evidence." RP at 512. The trial court then instructed the jury to "disregard anything that was evidence presented during the trial." RP at 512.

*Sentence and Conditions*

The jury found Robb guilty of both second degree child rape and second degree child molestation. The trial court sentenced Robb to 90 months in prison. As part of Robb's sentence, the trial court imposed sentencing conditions prohibiting him from having any contact with

minors, possessing, consuming or delivering controlled substances, and using or possessing sexually explicit material.

Robb appeals his convictions and sentencing conditions.

ANALYSIS

A.    ADMISSIBILITY OF EXPERT DNA TESTIMONY

Robb argues that the trial court erred in admitting Dixon's expert DNA testimony because that testimony (1) did not satisfy the *Frye* test for novel scientific theories and (2) was not helpful to the jury under ER 702.  We disagree.

1.    *Frye* Test

Robb argues that, under *Frye*, Dixon should not have been allowed to testify about the results of the Y-STR analysis.  More specifically, he claims that (1) Dixon's use of the U.S. Y-STR Database does not satisfy the *Frye* test because it is not representative of the relevant population, and (2) there is no general acceptance about using a DNA sample that contains only four testable locations on the Y chromosome.  We do not consider the first argument, which is raised for the first time on appeal, and disagree with the second.

a.    Legal Principles

When an expert's testimony is based on a novel scientific theory, we employ *Frye* to determine its admissibility.  *State v. Green*, 182 Wn. App. 133, 148, 328 P.3d 988, *review denied*, 181 Wn.2d 1019 (2014).  Under *Frye*, we look to whether a theory and underlying methodology are accepted in the relevant scientific community.  *Id.* at 149.  In addition, "the *Frye* test focuses on general scientific theories, not particular opinions based on those theories." *Id. Frye* is not implicated if an expert's specific opinions are grounded in accepted science, even

if those opinions themselves are not generally accepted. *Id.* And disputes over whether an acceptable technique was correctly performed in a particular situation go to weight, not admissibility. *State v. Bander*, 150 Wn. App. 690, 699, 208 P.3d 1242 (2009).

We review a trial court's decision to admit testimony under *Frye* de novo. *State v. Brewczynski*, 173 Wn. App. 541, 555, 294 P.3d 825 (2013).

> b. Background on DNA Analysis

An in-depth overview of forensic DNA analysis was provided in *Bander*, 150 Wn. App. at 699-709. Dixon provided similar testimony at trial. The PCR-STR analysis used by Dixon in this case and by forensic scientists generally allows them to isolate the portions of DNA that vary between individuals. *Id.* at 699. These portions, known as alleles, sit in pairs at various loci along a strand of DNA. *Id.* The overall combination of alleles – a person's DNA profile – is different from person to person. *Id.* When an analyst uses the PCR-STR process, he makes millions of copies of each locus and uses those copies to see which alleles are present. *Id.* at 700.

In certain cases, a sample will contain both male and female DNA. To isolate the male DNA, analysts can use a PCR Y-STR analysis. *Id.* This analysis is essentially the same as the standard analysis, except that it targets the portion of male Y chromosome passed down through paternal lineage. *Id.* at 700. The Y-STR analysis does not discern between men of the same paternal lineage. *Id.* Dixon testified that there are 17 specific locations on the Y chromosome that scientists examine in generating a DNA profile.

After employing the PCR process, the analyst can compare alleles present in an evidence sample, like a swab taken from a victim, and a reference sample, like one taken from a suspect. *Id.* at 701. The Y-STR analysis can exclude a reference sample as the source of the evidence

DNA. *Id.* If any of the alleles identified from either sample do not match, the reference sample can be excluded. *Id.* If all of the alleles match, the reference is termed a possible or potential contributor. *Id.*

Dixon testified that, at that point, the DNA analyst develops a statistic in which he compares the evidence sample to a database that houses historic Y-STR profiles. Dixon used the U.S. Y-STR Database, a nationwide law enforcement collection of DNA profiles. He created the statistic using the "count method," by which the analyst counts the number of recorded profiles that matched the evidence sample. The number of matches is then divided by the total number of profiles in the database. This comparison allows the analyst to estimate how common the sample profile is in the general population.

The ability of DNA analysis to discriminate between potential contributors depends upon the number of loci that have matching alleles. *Bander*, 150 Wn. App. at 706-07. When the analyst cannot determine whether an allele is present, fewer individuals can be excluded as contributors. *Id.* at 705.

c. DNA Comparison Database

Robb argues that Dixon's use of the U.S. Y-STR Database did not satisfy the *Frye* test because it is not representative of the relevant population. But we do not consider this argument because he did not make it in the trial court.

Parties generally may not raise arguments for the first time on appeal. *State v. Stoddard*, 192 Wn. App. 222, 226, 366 P.3d 474 (2016). Requiring parties to preserve their evidentiary objections at trial serves multiple functions, including allowing the trial court an opportunity to rule correctly before an issue is appealed, preserving judicial economy, facilitating appellate

review, and allowing a party's opponent to fully address the issues. *Id.* at 226-27. That same logic governs in the *Frye* context: where a *Frye* argument was not raised below, the argument need not be considered on appeal. *State v. Newbern*, 95 Wn. App. 277, 290, 975 P.2d 1041 (1999). Although courts usually apply this rule to bar *Frye* arguments when an appellant failed to request a *Frye* hearing altogether, the rationale applies with equal strength when the appellant challenges expert testimony on grounds not raised below.

Here, Robb did not address, much less object to, Dixon's use of the U.S. Y-STR Database. Although Robb invoked *Frye*, he failed to allow the trial court or the State to address the argument he now makes on appeal. "[E]videntiary error is unpreserved unless a timely objection or motion to strike is made that states the specific ground of objection" or unless the grounds for an objection is apparent from the context. *State v. Wilbur-Bobb*, 134 Wn. App. 627, 634, 141 P.3d 665 (2006) (applied to an appeal raising *Frye*). Context did not make clear that Robb objected to the database Dixon relied on. Because Robb failed to raise this ground for objection at trial, he waived the argument and we do not address it.

d.    Limited DNA Profile

Dixon based his analysis on alleles found in only 4 of the 17 locations on the Y chromosome. Robb argues that the limited Y-STR profile Dixon used to develop his opinions is not generally accepted in the scientific community.

But Y-STR analysis is generally accepted. "There is no question that the underlying scientific theory of DNA typing," the PCR-STR method, "is accepted in the scientific community for identification purposes in the forensic setting." *State v. Gentry*, 125 Wn.2d 570, 586, 888 P.2d 1105 (1995). "YSTR amplification is essentially the same as the PCR-STR

process." *Bander*, 150 Wn. App. at 700. For that reason, a *Frye* hearing is unnecessary to admit testimony on Y-STR statistical analysis. *Id.* at 718. Further, courts commonly allow testimony on results from partial DNA analysis. *See, e.g.*, *State v. Sublett*, 156 Wn. App. 160, 173-74, 231 P.3d 231 (2010); *State v. Afeworki*, 189 Wn. App. 327, 332, 358 P.3d 1186 (2015), *review denied*, 184 Wn.2d 1036 (2016).

Robb offers no alternative authority, and merely suggests that "when the initial sample is very small, the reliability of the testing procedure is greatly diminished." Br. of Appellant at 19. However, arguments about whether a test was properly performed go to weight, not admissibility. *Bander*, 150 Wn. App. at 699. In addition, a challenge to an expert's specific opinions that are grounded in accepted science does not implicate *Frye*. *Green*, 182 Wn. App. at 148-49.

We affirm the trial court's admission of Dixon's testimony under *Frye*.

2.    Admission Under ER 702

Robb argues that even if Dixon's opinions satisfied the *Frye* test, the trial court erred in admitting the DNA evidence under ER 702. We disagree.

ER 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Testimony should be admitted under ER 702 when (1) the witness is qualified as an expert, (2) the expert's opinion is based on a theory generally accepted in the scientific community, and (3) the expert's testimony is helpful to the trier of fact. *State v. Rafay*, 168 Wn. App. 734, 784, 285 P.3d 83 (2012). Expert testimony is helpful when it concerns issues

outside common knowledge and is not otherwise misleading. *State v. Groth*, 163 Wn. App. 548, 564, 261 P.3d 183 (2011). We interpret helpfulness broadly and in favor of admissibility. *Id.* We review a trial court's admission of expert testimony under ER 702 for abuse of discretion. *State v. Cheatam*, 150 Wn.2d 626, 645, 81 P.3d 830 (2003).

Dixon analyzed DNA found on DIA and testified that the testing was consistent with the DNA coming from Robb. This testimony could help the jury evaluate the evidence.

Robb argues that Dixon's testimony regarding the DNA sample should have been excluded because it was overly speculative. He argues that the limited amount of DNA taken from DIA's breast could have arrived there by secondary transfer rather than by direct contact. However, Dixon addressed the small amount of DNA he found and the possibility of either secondary transfer or one of Robb's male relatives as the source of the DNA. In response to Robb's questioning, Dixon also stated that if any one of the missing alleles did not match Robb's DNA, Robb would be excluded. Dixon concluded that, based on a comparison with the Y-STR Database, one in nine individuals matched the four alleles taken from DIA's sample.[3] Dixon's explanation appropriately allowed the jury to determine what weight to attribute to an inclusion. *See Bander*, 150 Wn. App. at 712.

Dixon's testimony explaining the DNA analysis was helpful to the jury and was not otherwise misleading. We hold that the trial court did not abuse its discretion under ER 702 in allowing Dixon to testify.

---

[3] Robb himself twice mischaracterized the result as showing a "roughly an 11 percent chance" that the DNA sample matched his own. RP at 231, 493. This misstated the evidence in his favor, as the proper characterization would be that 11 percent of the comparison database matched the sample.

B.     APPLICABILITY OF HEARSAY EXCEPTIONS

Robb argues that the trial court erred in admitting testimony by Gariano, Shannon, and Dr. Meyers about hearsay statements DIA made to them.  He argues that the trial court incorrectly applied the excited utterance and medical diagnosis exceptions to the hearsay rule. We disagree.

1.     Legal Principles

Under ER 801(c), "hearsay" is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." The statements DIA made to Gariano, Shannon, and Dr. Meyers clearly constitute hearsay. Hearsay generally is inadmissible under ER 802, but ER 803 provides several exceptions to that rule of inadmissibility.  *State v. Alvarez-Abrego*, 154 Wn. App. 351, 366, 225 P.3d 396 (2010). The exceptions at issue here are the excited utterance exception (ER 803(a)(2)) and medical treatment exception (ER 803(a)(4)).

We review a trial court's ruling on the applicability of a hearsay exception for an abuse of discretion.  *State v. Rodriquez*, 187 Wn. App. 922, 939, 352 P.3d 200, *review denied*, 184 Wn.2d 1011 (2015).  A trial court abuses its discretion if its decision is manifestly unreasonable or based upon untenable grounds or reasons.  *Id.*

2.     Excited Utterance Exception

ER 803(a)(2) provides a hearsay exception for statements "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."  The exception is based on the idea that statements made while a person is under the stress of an exciting event will be spontaneous rather than based on reflection or self-interest, and

13

therefore are more likely to be true. *See State v. Chapin*, 118 Wn.2d 681, 686, 826 P.2d 194 (1992).

For the excited utterance exception to apply, the declarant's statement must meet three requirements: "(1) a startling event or condition occurred, (2) the declarant made the statement while under the stress of excitement of the startling event or condition, and (3) the statement related to the startling event or condition." *State v. Ohlson*, 162 Wn.2d 1, 8, 168 P.3d 1273 (2007). Relevant factors include the statement's spontaneity, the passage of time, the declarant's emotional state, and the declarant's opportunity to reflect or fabricate a story. *State v. Williamson*, 100 Wn. App. 248, 258, 996 P.2d 1097 (2000).

Robb contests the second requirement – whether DIA made her statements to Gariano and Shannon while still under the stress of the event. But it is undisputed that DIA was visibly upset at the time. When DIA arrived at Gariano's house, she was clearly upset and was crying hysterically. By the time Shannon arrived about 30 minutes later, DIA was still crying and shaking. It took DIA another 20 minutes to recount to her mother basic details of what happened. The passage of between 30 minutes and an hour is not enough to bring DIA's statements outside the exception, and in events similar to these courts have applied the exception to statements made after a significantly greater passage of time. *See State v. Thomas*, 46 Wn. App. 280, 284, 730 P.2d 117 (1986), *aff'd*, 110 Wn.2d 859 (1988) (6 or 7 hours after rape); *State v. Woodward*, 32 Wn. App. 204, 206-07, 646 P.2d 135 (1982) (20 hours after rape); *State v. Fleming*, 27 Wn. App. 952, 956, 621 P.2d 779 (1980) (3 to 4 hours after rape).

Robb argues that DIA's testimony shows an opportunity to consciously reflect on the situation. He points to her attempt to act as normally as possible before Robb left the house and

to her communication with her mother immediately afterwards. A declarant's reflection and intervening actions can affect application of the excited utterance exception. *See State v. Brown*, 127 Wn.2d 749, 757-59, 903 P.2d 459 (1995) (refusing to apply the exception when the declarant "had the opportunity to, and did in fact, decide to fabricate a portion of her story"); *State v. Hochhalter*, 131 Wn. App. 506, 516, 128 P.3d 104 (2006) (refusing to apply the exception when the declarants "reflected beforehand . . . [and] consciously and intentionally omitted part of what they had observed").

However, the opportunity for reflection does not always preclude application of the excited utterance exception. This court's opinion in *State v. Williams*, 137 Wn. App. 736, 154 P.3d 322 (2007), is instructive. In that case, the victim was dropped off at her house by the defendant after being raped. *Id.* at 741. She immediately started to take a shower, but soon realized that might be a mistake. *Id.* She instead changed her clothes and went to a friend's house, careful to walk in roadside ditches in case the defendant drove by again. *Id.* at 741-42. Despite the victim's presence of mind to make calculated actions, the totality of the evidence, including her clearly upset demeanor and visible injuries from the attack, demonstrated she was still under the influence of the event. *Id.* at 749.

Here, DIA's ability to compose herself while still threatened does not indicate that she was no longer under the influence of the shock from that morning. Testimony showed DIA was visibly traumatized when she told Gariano and Shannon what happened.

Robb also argues that DIA's earlier phone conversation with her mother precludes application of ER 803(a)(2) to her later statements. But a declarant's earlier stress-induced communication does not render inadmissible any later excited utterances. *See Williams*, 137 Wn.

15

App. at 749 (victim called her mother before arriving home and making the contested statements). Robb does not explain how DIA's earlier texts and phone call to Shannon prevented her later statements from being excited utterances, despite testimony that those later statements were made while DIA remained visibly shaken.

We hold that the trial court did not abuse its discretion by applying the excited utterance exception to admit DIA's statements through Gariano and Shannon.

### 3. Medical Treatment Exception

ER 803(a)(4) provides a hearsay exception for "[s]tatements made for the purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." This exception applies to statements reasonably pertinent to medical diagnosis or treatment. *State v. Doerflinger*, 170 Wn. App. 650, 664, 285 P.3d 217 (2012). A statement is reasonably pertinent to diagnosis or treatment when (1) the declarant's motive is to promote medical treatment and (2) the medical professional reasonably relies on the statement for treatment purposes. *Id.* Robb challenges both requirements for admission of DIA's statements to Dr. Myers under the medical treatment exception.

#### a. DIA's Motive

There was sufficient evidence that DIA's motive in talking with Dr. Myers was to receive medical treatment. DIA's examination was conducted in a hospital emergency room. Dr. Myers expressly told DIA that she was going to perform an exam, and proceeded to ask DIA questions

16

about her medical and social history. Dr. Myers then conducted a general physical examination, which included checking for injuries.

Robb argues that the State must make a greater showing when a child received medical treatment at the State's urging. But the case he cites for support, *State v. Carol M.D.*, 89 Wn. App. 77, 948 P.2d 837 (1997), *adhered to in part on remand*, 97 Wn. App. 355, 983 P.2d 1165 (1999), should not be read so broadly and is distinguishable from this case. In *Carol M.D.*, a child victim did not understand why she was at a counseling session arranged by a social agency. 89 Wn. App. at 86. Here, the evidence shows that DIA knew why she was in the emergency room. And she was seen by a doctor, not a counselor procured by a social agency. This court in *State v. Kilgore* distinguished *Carol M.D.* because that case "involved a therapist and the child explicitly denied knowing what a therapist did." 107 Wn. App. 160, 184, 26 P.3d 308 (2001).

We hold that DIA's statement satisfied the medical motive requirement.

  b. Reasonably Relied on for Medical Treatment

To challenge the treatment prong, Robb argues that DIA's inculpating statements did not advance her treatment and the doctor did not rely on them for treatment purposes. He argues that the statements were instead intended to collect evidence.

The general rule is that a declarant's statements about who caused her injuries are not pertinent to treatment or diagnosis. *State v. Butler*, 53 Wn. App. 214, 220, 766 P.2d 505 (1989). However, a limited exception applies in child abuse cases. With child abuse victims, not only must a treating physician be aware of a child's potential psychological and emotional injuries, but identifying the potential abuser is relevant to preventing future abuse. *Id.* at 220-21; *see also Williams*, 137 Wn. App. at 746. Similarly, the court in *Williams* recognized that sexual assault

17

exams serve both a forensic and medical function. 137 Wn. App. at 747; *see also State v. Sims*, 77 Wn. App. 236, 240, 890 P.2d 521 (1995) (noting that a physician generally must know who the abuser was in order to render proper treatment because the treatment will differ when the abuser is a member of the victim's family or household).

In this case, the exam served both a forensic and medical purpose. Dr. Myers began by collecting a patient history, first asking DIA general questions before moving to specific ones about what caused DIA to come to the emergency room. Dr. Myers testified that she performs the same pelvic exam on all sexual assault patients. She testified that the exam is conducted for the patient's protection, including to identify trauma and to test for sexually transmitted diseases. Although Dr. Myers asked about DIA's contact with Robb, she reasonably relied on the exam to identify what steps to take in DIA's treatment.

We hold that the trial court did not abuse its discretion under the medical treatment exception in admitting DIA's statements to Dr. Myers.

C.      PROSECUTORIAL MISCONDUCT

Robb argues that the State made three statements during closing argument that amount to prosecutorial misconduct. Despite his failure to object to the first two of these statements, Robb argues that they were prejudicial when considered individually and together. We disagree.

1.      Legal Principles

To prevail on a claim of prosecutorial misconduct, a defendant must show that "in the context of the record and all of the circumstances of the trial, the prosecutor's conduct was both improper and prejudicial." *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012). We review the prosecutor's conduct and whether prejudice resulted therefrom "by

examining that conduct in the full trial context, including the evidence presented, 'the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury.' " *State v. Monday*, 171 Wn.2d 667, 675, 257 P.3d 551 (2011) (internal quotation marks omitted) (quoting *State v. McKenzie*, 157 Wn.2d 44, 52, 134 P.3d 221 (2006)).

When the defendant fails to object to the challenged portions of the prosecutor's argument, he is deemed to have waived any error unless the prosecutor's misconduct was so flagrant and ill-intentioned that an instruction could not have cured the resulting prejudice. *State v. Emery*, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012). In making this determination, we "focus less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured." *Id.* at 762. The defendant must show that (1) no curative instruction would have eliminated the prejudicial effect, and (2) the misconduct resulted in prejudice that had a substantial likelihood of affecting the verdict. *Id.* at 760-61.

Misconduct that is relatively minor or insignificant is not grounds for reversal. Our Supreme Court has noted that " '[a] defendant is entitled to a fair trial but not a perfect one.' " *State v. Davis*, 175 Wn.2d 287, 345, 290 P.3d 43 (2012) (internal quotation marks omitted) (quoting *Brown v. United States*, 411 U.S. 223, 231, 93 S. Ct. 1565, 36 L. Ed. 2d 208 (1973)).

2.   "Abiding Belief in Truth" Comment

The prosecutor told the jury that "[i]f you have an abiding belief in the truth of the charge, you are satisfied beyond a reasonable doubt." RP at 488. She also asked if the jury had an abiding belief that the testimony at trial was accurate. Robb did not object. He now argues

that this statement improperly suggested that the jury must determine the truth of what happened and mischaracterized the prosecutor's burden of proof.

The jury's role is not to solve the case, but rather to determine whether the prosecution has proved its case beyond a reasonable doubt. *Emery*, 174 Wn.2d at 760. Therefore, it is improper for a prosecutor to characterize the jury's role as finding the "truth" of the events at trial. *Id.* This court has held it improper for a prosecutor to argue that the jury must "get to the truth," *State v. Evans*, 163 Wn. App. 635, 644, 260 P.3d 934 (2011), or "declare the truth." *State v. Anderson*, 153 Wn. App. 417, 429, 220 P.3d 1273 (2009).

But here, the prosecutor was simply repeating the trial court's instruction to the jury about reasonable doubt, to which Robb did not object. The instruction stated, "If, from such consideration [of all the evidence or lack of evidence], you have an abiding belief in the truth of the charge, you are satisfied beyond a reasonable doubt." Clerk's Papers at 51. Further, rather than ask the jury to solve the crime, the prosecutor's argument asked the jury whether it believed the charge was truthful, implicitly comparing the charge to the testimony and evidence presented at trial. This argument did not distract the jury from its role of weighing evidence and testing the prosecutor's case.

The prosecutor's "abiding belief" statements also did not improperly diminish the State's burden of proof. In *State v. Osman*, the defendant asked during closing argument whether the jury had "an abiding belief in the truth of the charge." 192 Wn. App. 355, 374, 366 P.3d 956, (2016). The court held that the statement was not improper because "reference to an 'abiding conviction' impressed on the jurors 'the need to reach a subjective state of near certitude of the guilt of the accused.' " *Id.* at 375 (internal quotation marks omitted) (quoting *Victor v. Nebraska*,

20

511 U.S. 1, 15, 114 S. Ct. 1239, 127 L. Ed. 2d 583 (1994)). The prosecutor's comments here were appropriate under *Osman*. Further, the context in which the prosecutor used the phrase – she explained that meeting the reasonable doubt standard was a heavy burden – indicates that the prosecutor was not attempting to diminish the State's burden of proof.

We hold that the prosecutor's comments about the jury having an abiding belief in the truth of the charge were not improper.

3. Arguing Facts Not in Evidence

Robb contests two statements made during the prosecutor's closing. First, the prosecutor stated that a DNA match would most likely be on DIA's breast and that it was not unusual to find a partial sample. Second, the prosecutor commented that, in order for DIA to have fabricated her injury, she would have had to recount the lie to, among other people, detective Luvera. The record did not support either statement. Although prosecutors may argue reasonable inferences from evidence, it is improper for a prosecutor to submit to a jury evidence not admitted at trial. *Glasmann*, 175 Wn.2d at 704-05.

The State admits that the prosecutor's statement about the partial DNA sample was improper. But Robb did not object to this statement. Therefore, he must show that the comment was so flagrant and ill-intentioned that an instruction could not have cured it. *Emery*, 174 Wn.2d at 760-61. Because the comment was not inflammatory, the trial court could have cured any prejudice with a curative instruction.

Regarding the statement about Luvera, Robb objected on the grounds that the detective did not testify about anything DIA told her. The trial court sustained the objection, admonishing that the parties "argue the evidence" and that the jury should "disregard anything that was

21

evidence presented during the trial." RP at 512. Robb argues that this misworded instruction was confusing, and that a proper instruction could not have cured any prejudice.

The prosecutor's comment arguably was not improper. The prosecutor's hypothetical was that, to fabricate a story, DIA would have had to consistently recount that story to multiple people, including Luvera. Although Luvera did not testify as to what DIA told her, the prosecutor was neither characterizing the detective's testimony nor extrapolating from it. Even though the trial court sustained the objection, the statement was fairly innocuous.

Further, although the trial court may have misstated the curative instruction, Robb does not show how this prejudiced him. The trial court sustained his objection, which cut off the prosecutor's line of argument. The effect of the instruction was to prevent the argument, and the judge clearly stated that "I'll go ahead and strike any references to what a person may or might have said as opposed to what the evidence is." RP at 512. Robb does not show that the statements impacted the jury verdict.

We hold that the prosecutor's comments about facts not in evidence are insufficient to support a prosecutorial misconduct claim.

4. Cumulative Error

Robb argues that the cumulative effect of the prosecutor's arguments amounts to reversible error. Although it is possible for otherwise harmless errors to cumulate, "[t]he defendant bears the burden of proving an accumulation of error of sufficient magnitude that retrial is necessary." *State v. Yarbrough*, 151 Wn. App. 66, 98, 210 P.3d 1029 (2009). The cumulative error doctrine "does not apply where the errors are few and have little or no effect on the outcome of the trial." *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006).

22

Here, Robb failed to show how the statements individually impacted the jury's verdict, and does not demonstrate any other cumulative effect. We reject Robb's cumulative error claim.

D.       DOUBLE JEOPARDY

Robb argues, and the State concedes, that his convictions for both child rape and child molestation violate double jeopardy. The State agrees that the child molestation conviction should be vacated. We accept the State's concession and agree.

The constitutional guarantee against double jeopardy protects defendants from being punished multiple times for the same offense. *State v. Mutch*, 171 Wn.2d 646, 661, 254 P.3d 803 (2011); *see* U.S. CONST. amend. V; WASH. CONST. art. I, § 9. The State must make it manifestly apparent that it is not seeking to impose multiple punishments for the same offense and that every count is based on a separate act. *Mutch*, 171 Wn.2d at 664. The remedy when a defendant is punished multiple times for the same offense is to vacate the lesser charge. *Weber*, 159 Wn.2d at 269.

Here, the trial court did not instruct the jury that it could find Robb guilty of each count only based on distinct acts. The prosecutor did not make this distinction clear either. She explained the elements of the rape and molestation charges, but did not indicate at any point that a guilty verdict for each charge must be based on separate actions. As the State concedes, the record does not demonstrate that it was manifestly apparent that the jury must base only one punishment on each offending act.

We vacate Robb's conviction for second degree child molestation, the lesser charge.

E.    SENTENCING CONDITIONS

Robb argues that the trial court erred in imposing a sentencing condition prohibiting him from having contact with minors because the condition exceeded its statutory authority and violated his fundamental right to parent his minor son.  We disagree.

Rob also argues, and the State concedes, that the trial court erred in imposing sentencing conditions relating to controlled substances and sexually explicit material.  We accept the State's concession and agree.

1.    Legal Principles

RCW 9.94A.505(8) grants trial courts the authority to impose "crime-related prohibitions" as a part of a sentence.  RCW 9.94A.030(10) provides that " '[c]rime-related prohibition' means an order of a court prohibiting conduct that directly relates to the circumstances of the crime for which the offender has been convicted."

We review a trial court's crime-related prohibitions for an abuse of discretion.  *State v. Irwin*, 191 Wn. App. 644, 656, 364 P.3d 830 (2015).  A trial court abuses its discretion when a decision is either manifestly unreasonable or is based on untenable grounds or untenable reasons.  *Id.*  Generally, we uphold sentencing conditions if they are reasonably related to the crime.  *State v. Warren*, 165 Wn.2d 17, 32, 195 P.3d 940 (2008).  But a prohibition is manifestly unreasonable if it violates a defendant's constitutional rights.  *State v. Sanchez Valencia*, 169 Wn.2d 782, 792, 239 P.3d 1059 (2010).

2.    Prohibition on Contact with Minors

First, Robb argues that the trial court had no statutory authority to prohibit him from having contact with minors because the prohibition had no reasonable relationship to the charged

crime. However, Robb's crime involved the rape of a minor who he parented. Therefore, prohibiting Robb from having contact with all minors – including a son that he parented – was crime-related. Further, Robb actually stipulated to this sentencing condition.

Second, Robb argues that the sentencing condition violates his constitutional right to parent his minor son. Parents have a fundamental right to raise their children without state interference. *State v. Corbett*, 158 Wn. App. 576, 598, 242 P.3d 52 (2010).

We carefully review sentencing conditions that interfere with a fundamental constitutional right. *Warren*, 165 Wn.2d at 32. Conditions that interfere with fundamental rights must be "reasonably necessary to accomplish the essential needs of the State and public order." *Id.* In addition, such conditions must be "narrowly drawn," and "[t]here must be no reasonable alternative way to achieve the State's interest." *Id.* at 34-35. "[T]he interplay of sentencing conditions and fundamental rights is delicate and fact-specific, not lending itself to broad statements and bright line rules." *In re Pers. Restraint of Rainey*, 168 Wn.2d 367, 377, 229 P.3d 686 (2010). Even though we carefully review sentencing conditions that interfere with fundamental rights, we still review the imposition of such conditions for an abuse of discretion. *Warren*, 165 Wn.2d at 32.

One of the State's "essential needs" is a compelling interest in protecting and preventing harm to children. *Corbett*, 158 Wn. App. at 598. Therefore, a trial court can impose a sentencing condition that restricts parenting rights if necessary to further this compelling interest. *Id.* Specifically, a trial court may prevent a convicted defendant from contacting his or her children when the court reasonably fears that such contact would threaten the children's welfare. *State v. Berg*, 147 Wn. App. 923, 942-43, 198 P.3d 529 (2008).

Out of concern for children's welfare, courts have upheld no-contact orders that limit a defendant's contact with children that belong in the same class as a minor victim. Two cases are instructive.

First, in *State v. Berg*, the defendant lived with his girlfriend's two children and a biological daughter he had with his girlfriend. 147 Wn. App. at 927. The defendant was convicted of rape and child molestation of his girlfriend's daughter. *Id.* at 926-30. The defendant testified that he had parented the victim. *Id.* at 930. Division One of this court affirmed a sentencing condition that prohibited the defendant from unsupervised contact with any female minor, including his biological daughter. *Id.* at 942-44. The court held that because Berg lived with the victim and committed the abuse in the home, an order restricting contact with other female children who lived in the home was reasonable to protect those children from the same type of harm. *Id.* at 943.

Second, in *Corbett*, the defendant was convicted of raping his step-daughter. 158 Wn. App. at 581-86. He lived with the victim and was her primary caregiver when she was not with her biological father. *Id.* at 582. The defendant also had two biological sons from a previous marriage. *Id.* at 597. This court affirmed a sentencing condition barring the defendant from contacting his minor sons. *Id.* at 597-601. The court emphasized that, as in *Berg*, the defendant lived in the same home as his victim. *Id.* at 598-99. Because the defendant sexually abused a minor in his care, the no-contact order was necessary to protect his own children "because of his history of using the trust established in a parental role to satisfy his own prurient desire to sexually abuse minor children." *Id.* at 599.

The court rejected the same claim Robb now makes. The court stated,

Insofar as Corbett argues that the no-contact order is not narrowly tailored to serve the State's interest in protecting children because it applies to his sons when his victim was a girl, we disagree. Here, the trial court had ample evidence to apply the no-contact order to all of Corbett's children regardless of their sex. The State showed that *all* of Corbett's children are at risk. Corbett's victim was a child whom he parented. Corbett committed the sexual abuse of J.O. while other children were in the home . . . . And although the crimes for which Corbett was convicted involved a minor girl, his method of sexual intercourse was not gender specific. These facts sufficiently support the sentencing court's decision to prohibit Corbett's contact with all children, not just other people's children and not just his daughters, if he had any.

*Id.* at 600.

The facts here are similar. As in *Corbett*, Robb abused his parenting role to take advantage of a child. It also is not in Robb's favor that his relationship with DIA lasted several years instead of the several months in *Corbett*. Also as in *Corbett*, Robb's abuse took place with other children in the house. Finally, as in *Corbett*, Robb's breach of the parent-child relationship was substantial and "establishes that [the defendant] abuses parental trust to satisfy his own prurient interests." *Id.* at 601. We follow *Corbett* and hold that the trial court's sentencing condition did not violate Robb's right to parent.

The trial court's sentencing condition preventing Robb from contacting minors, including his son, is related to his crime and does not violate his constitutional right to parent. We hold that the trial court did not error in imposing this sentencing condition.

3. Controlled Substances and Sexually Explicit Materials

The trial court imposed sentencing conditions prohibiting Robb from possessing, consuming, or delivering controlled substances and from using or possessing sexually explicit material. As the State concedes, there was no evidence that controlled substances or sexually

27

explicit material related in any way to Robb's crime. Therefore, RCW 9.94A.505(8) did not authorize these conditions.

We remand for the trial court to strike the controlled substances and sexually explicit material sentencing conditions.

F.      APPELLATE COSTS

Robb requests that this court refrain from awarding appellate costs if the State seeks them. Under RCW 10.73.160(1), we may order adult offenders to pay appellate costs. However, we have the discretion not to award costs. RAP 14.2; *State v. Sinclair*, 192 Wn. App. 380, 389-90, 367 P.3d 612, *review denied*, 185 Wn.2d 1034 (2016). *Sinclair* indicated several relevant factors when determining ability to pay, including the defendant's age and employment history, as well as family, education, criminal history, and length of the defendant's sentence. 192 Wn. App. at 391.

In this case, these factors cut both ways. In favor of imposing costs are Robb's relatively young age at 33 and his consistent income and employment for a single employer for seven years before his conviction. Factors against imposing costs are the trial court's finding that Robb was indigent, the assumption under RAP 15.2(f) that he remains indigent throughout the appeal, and the fact that he was sentenced to 90 months.

Weighing these considerations, we exercise our discretion to waive appellate costs.

CONCLUSION

We affirm Robb's conviction for second degree child rape, but we remand for the trial court to vacate Robb's conviction for second degree child molestation and to strike the sentencing conditions regarding controlled substances and sexually explicit material.

No. 47890-1-II

A majority of the panel having determined that this opinion will not be printed in the

Washington Appellate Reports, but will be filed for public record in accordance with RCW

2.06.040, it is so ordered.

MAXA, A.C.J.

We concur:

JOHANSON, J.

MELNICK, J.